**Dae Sung LEE, Plaintiff,**

**v.**

**UNITED STATES TAEKWONDO UNION, a Colorado nonprofit Corporation; United States Olympic Committee, a federally chartered nonprofit corporation, Defendants.**

**Civil No. 04–00461 SOM–LEK.**

United States District Court,
D. Hawai'i.

Aug. 13, 2004.

Ward D. Jones, Bervar & Jones, Honolulu, HI, for Plaintiff.

David M. Louie, April Luria, Roeca Louie & Hiraoka, Honolulu, HI, Mark S. Levinstein, Williams & Connolly, Washington, DC, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION*

MOLLWAY, District Judge.

## I. INTRODUCTION.

This action concerns the former coach of the 2004 United States Olympic Taekwon-

do Team, Plaintiff Dae Sung Lee. Lee, a very successful taekwondo athlete and coach of previous national taekwondo teams, says that he was removed as coach of the 2004 United States Olympic Taekwondo Team because he is of Korean ancestry. Just two weeks before the opening ceremonies for the 2004 Summer Olympics in Athens, Greece, Lee moved for a temporary restraining order and preliminary injunction, claiming that Defendants United States Olympic Committee ("USOC") and United States Taekwondo Union ("USTU") (collectively, "Defendants") have discriminated against him on the basis of his race in violation of 42 U.S.C. § 1981 and have breached his contract for employment as coach of the 2004 United States Olympic Taekwondo Team. Lee asks this court to order Defendants "to reinstate PLAINTIFF either as sole head coach or as one of two credentialed coaches of the United States 2004 Olympic Taekwondo Team and to fulfill the normal duties of financial support and cooperation through to the time of the completion of the 2004 Olympic Games." Memorandum in Support of Motion at 30; *see also* Complaint (July 28, 2004) ¶ 38.

Defendants have moved to dismiss Lee's Complaint, arguing that all of Lee's claims are preempted by the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. §§ 220501–220529 (2001) ("Amateur Sports Act"), formerly 36 U.S.C. §§ 371–396 (1988).

The parties, in discussion with the court, agreed to expedited briefing and to a schedule for an evidentiary hearing, noting that the taekwondo events would be held between August 26 and August 29, 2004. In accordance with that schedule, this court held an evidentiary hearing on the motions yesterday. The court now hastens to issue its ruling.

Defendants' motion to dismiss is denied in part and granted in part. To the extent Lee challenges eligibility requirements under the Amateur Sports Act, the motion is granted because that Act preempts those claims. However, to the extent Lee separately claims racial or national origin discrimination under 42 U.S.C. § 1981, the motion is denied.

Lee's motion for injunctive relief under § 1981 is denied. Even assuming Lee states a prima facie race discrimination claim, Defendants have demonstrated legitimate, nondiscriminatory reasons for their actions, and Lee has failed to demonstrate that those reasons are really a pretext for racial or national origin discrimination.

## II. THE MOTION TO DISMISS IS GRANTED IN PART AND DENIED IN PART.

### A. Standard for Dismissal.

Defendants argue that this court lacks jurisdiction over all of the claims in the Complaint because the Amateur Sports Act grants the USOC exclusive jurisdiction over those claims. The court treats this motion as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

A motion brought under Rule 12(b)(1) may either attack the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or attack the existence of subject matter jurisdiction in fact. *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir.1979). When a motion to dismiss attacks the allegations of a complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.1996). When the motion to dismiss is

a factual attack on subject matter jurisdiction, however, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the existence of subject matter jurisdiction in fact. *Thornhill,* 594 F.2d at 733; *accord McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir.1988) ("when considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction"). Defendants' motion to dismiss based on the Amateur Sports Act's preemption of other laws is a facial attack on this court's subject matter jurisdiction.

B. *The Amateur Sports Act Preempts Lee's Challenge to the Requirements For the Coach of the 2004 United States Olympic Taekwondo Team.*

The International Olympic Committee ("IOC") owns the rights to the Olympic Games. *Michels v. United States Olympic Comm.,* 741 F.2d 155, 156 (7th Cir.1984). Each nation participating in the Olympic Games has an IOC-recognized committee, which, in turn, recognizes a national governing body for each sport. Thus, in the present case, the IOC has recognized the USOC as this country's committee, and the USOC has recognized the USTU as the national governing body for taekwondo. *See id.; see also* 36 U.S.C. § 220521(a) (2001) (formerly 36 U.S.C. § 391(a) (1988)).[1]

In part, the Amateur Sports Act created the USOC "to exercise exclusive jurisdiction ... over ... all matters pertaining to United States participation in the Olympic Games." 36 U.S.C. § 220503(3)(A) (2001) (formerly 36 U.S.C. § 374(3) (1988)); *Slaney v. Int'l Amateur Athletic Fed'n,* 244 F.3d 580, 594 (7th Cir.2001) (interpreting § 220503(3)). The Amateur Sports Act also created and required the USOC "to provide swift resolution of conflicts and disputes involving amateur athletics, national governing bodies, and amateur sports organizations, and protect the opportunity of any amateur athlete, *coach,* trainer, manager, administrator, or official to participate in amateur athletic competition." 36 U.S.C. § 220503(8) (2001) (formerly 36 U.S.C. § 374(8) (1988)) (emphasis added); 36 U.S.C. § 220509(a) (2001) (formerly 36 U.S.C. § 382b (1988)); *Slaney,* 244 F.3d at 594 (interpreting § 220503(8)); *Oldfield v. Athletic Congress,* 779 F.2d 505, 506–507 (9th Cir.1985) (interpreting § 374(8)).

The USOC was therefore granted the power to "facilitate, through orderly and effective administrative procedures, the resolution of conflicts or disputes that involve any of its members and any amateur athlete, coach ..., or amateur sports organization and that arise in connection with their eligibility for and participation in the Olympic Games." 36 U.S.C. § 22505(c)(5) (2001) (formerly 36 U.S.C. § 375(a)(5) (1988)). In pertinent part, the Amateur Sports Act requires national governing bodies to provide equal opportunities to athletes and coaches to participate in amateur athletic competitions without discrimination on the basis of race or national origin. *See* 36 U.S.C. § 220522(a)(8) (2001) (formerly 36 U.S.C. § 391(b)(6) (1988)).

In an athlete's challenge to a national governing body's decision that he was ineligible to compete in the Olympic shot put

---

**1.** The Amateur Sports Act was originally enacted in 1950 and amended in 1978. *See, e.g.,* 36 U.S.C. § 373 note (1988). It was amended and renumbered in 1998. *See, e.g.,* 36 U.S.C. § 220501 note (2001).

trials, the Ninth Circuit held that the Amateur Sports Act contained no express private right of action. *Oldfield*, 779 F.2d at 507. *Oldfield* involved a shot putter's challenge to the suspension of his amateur status. The athlete had signed a professional performance contract with the International Track Association and competed with that organization for four years. He then sought to reestablish his standing as an amateur, but The Athletic Congress (the national governing body for track and field events) and the USOC deemed him ineligible to participate in the 1984 Olympic tryouts on the ground that he would not be allowed to compete in the Olympic Games under IOC rules.

Oldfield then sued in federal court, alleging violations of the Amateur Sports Act. The district court denied injunctive relief, then granted summary judgment to the defendants. The Ninth Circuit affirmed the summary judgment, holding that the Amateur Sports Act contained no express private right of action allowing an athlete to challenge his eligibility determination. The Ninth Circuit then examined the four factors set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for determining the existence of an implied private right of action:

> (1) whether the plaintiff is a member of a class for whose especial benefit the statute was enacted; (2) whether there is an indication of Congress's intent to create or deny a private remedy; (3) whether a private remedy would be consistent with the statute's underlying purposes; and (4) whether the cause of action traditionally is relegated to state law. As more recent Supreme Court cases have made clear, however, the factors enunciated in *Cort* are not entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action.

*Oldfield*, 779 F.2d at 507. The Ninth Circuit examined the legislative history of the Amateur Sports Act and concluded that Congress had not intended to allow athletes to sue in federal court to enforce rights created by the Amateur Sports Act. *Id.*

Oldfield is consistent with the Seventh Circuit's decision in *Michels*, which involved a weightlifter's challenge to his disqualification from competition in the 1984 Olympic Games after a drug test showed a higher testosterone level than allowed by IOC rules. As Judge Posner noted in his concurrence in *Michels*, "there can be few less suitable bodies than the federal courts for determining the eligibility, or the procedures for determining the eligibility of athletes to participate in the Olympic Games." *Michels*, 741 F.2d at 159 (Posner, J., concurring).

Other courts have also determined "that strict questions of athletes' eligibility are preempted by the Amateur Sports Act's grant of exclusive jurisdiction to the USOC over all matters pertaining to United States participation in the Olympic Games." *Slaney*, 244 F.3d at 595 (involving runner Mary Decker Slaney's challenge to a determination that she had committed a doping offense); *Walton–Floyd v. United States Olympic Comm.*, 965 S.W.2d 35, 40 (Tex.App.—Hous.1998) (court notes, in considering a track and field athlete's challenge to a drug determination, that the legislative history of the [Amateur Sports] Act "indicates that Congress did not intend to provide individual athletes a private cause of action").

■ In 1998, the Amateur Sports Act was amended to expressly indicate that, although the USOC can sue and be sued in federal court, neither the provision allowing it to be sued, "nor any other provision of this chapter [36 U.S.C.A. § 220501 et seq.] shall create a private right of action

under this chapter." *See* 36 U.S.C. § 220505(b)(9) (2001) and notes on 1998 Amendments thereto. Thus, the USOC may be sued only with respect to matters not arising under the Amateur Sports Act, such as, for example, with respect to a dispute over a lease that the USOC may have signed with the landlord of its offices. Given this express statutory statement that Congress did not intend to create a private right of action under the Amateur Sports Act, Lee has no private right of action under that Act.

■ In apparent recognition of this limitation on private rights of action, Lee does not expressly assert a claim under the Amateur Sports Act. Instead, he asserts several claims that purport to be based on state law. His state law claims, however, clearly challenge the eligibility requirements for the coach of the 2004 United States Olympic Taekwondo Team. As eligibility to be a coach falls within the exclusive purview of the Amateur Sports Act, those state law claims are preempted by the Act.

In *Slaney*, the Seventh Circuit ruled that the Amateur Sports Act not only preempted eligibility challenges brought directly under it, but other state law causes of action that essentially sought relief based on the athlete's eligibility. Mary Decker Slaney was a world-class runner who tested positive for a prohibited testosterone substance after competing in the 5000-meter Olympic track and field trials. *Slaney*, 244 F.3d at 586. At a hearing before the United States of America Track and Field, Inc. ("USATF"), Slaney argued that the urine test used in determining that she had taken the prohibited substance was not scientifically proven and that the rules governing the test were vague and inconsistent. The USATF's hearing board agreed. *Id.* at 587. However, the International Amateur Athletic Federation, unsatisfied with the decision

by the USATF's hearing board, invoked an arbitration agreement. In arbitration, Slaney was ultimately found to have taken the prohibited testosterone. *Id.*

Slaney then filed suit in federal court. The district court dismissed the complaint. On appeal, the Seventh Circuit affirmed. Slaney argued that she was not bringing claims challenging any eligibility determination under the Amateur Sports Act. Instead, she said, she was alleging breach of contract and negligence in violation of state law. The Seventh Circuit found the state law claims preempted by the Amateur Sports Act because those claims sought to challenge the method by which the USOC determined the eligibility of athletes. *Id.* at 596.

Lee claims ultra vires activity, breach of contract, breach of implied contract, and interference with contract, and asserts rights to specific performance and equitable estoppel. All of these claims sound in state law. All essentially seek reinstatement of Lee as the coach of the 2004 United States Olympic Taekwondo Team. The claims are therefore akin to a challenge to eligibility determinations under the Amateur Sports Act. They challenge the method by which Lee was removed as coach and another person was named as coach. Lee has no right to bring such a challenge in court. *See Slaney*, 244 F.3d at 596; *Oldfield*, 779 F.2d at 507; 36 U.S.C. § 220505(b)(9) (2001).

C. *The Narrow Exception to the Amateur Sports Act's Preemption of Claims for Challenges to Breaches of Internal Rules is Inapplicable Here.*

■ To the extent the Complaint can be construed as arguing that Defendants failed to follow their own rules in naming Jean Lopez as the replacement for Lee as coach, Lee may not maintain that claim, as

he has not demonstrated that he exhausted his internal remedies for such a claim. Because the court must determine whether Lee exhausted his internal remedies, the court examines this claim as a factual attack on this court's jurisdiction.

The Seventh Circuit has recognized that, notwithstanding the Amateur Sports Act's preemption of claims, federal courts may play a very limited role in ensuring that amateur sports organizations follow their own internal rules for determining eligibility. *Id.* at 595 (citing *Harding v. United States Figure Skating Ass'n,* 851 F.Supp. 1476, 1479 (D.Or.1994)). The Seventh Circuit noted that courts should hesitate before intervening and stated: "Intervention is appropriate only in the most extraordinary circumstances, where the association has clearly breached its own rules, that breach will imminently result in *serious* and irreparable harm to the plaintiff, and the plaintiff has exhausted all internal remedies." However, courts "should not intervene in the merits of the underlying dispute." *Slaney,* 244 F.3d at 595–96 (quoting *Harding,* 851 F.Supp. at 1479). Because Slaney was not suggesting that the USOC failed to follow its own rules, the Seventh Circuit did not in that case apply the doctrine it discussed.

In *Harding,* the United States District Court for the District of Oregon examined claims lodged by figure skater Tonya Harding against the United States Figure Skating Association, Inc. ("USFSA"). Harding sought to enjoin disciplinary proceedings before the USFSA. As quoted in *Slaney,* the court noted that intervention in such proceedings "is appropriate only in the most extraordinary circumstances." *Harding,* 851 F.Supp. at 1479. The court described the necessary "extraordinary circumstances" as arising when 1) the association had clearly breached its own rules; 2) the breach would imminently result in serious and irreparable injury; and

3) the plaintiff had exhausted all internal remedies. *Id.* The court then found such "extraordinary circumstances."

The bylaws of the USFSA called for disciplinary hearings to be held on a date that was reasonably convenient for the parties. The court found that, when the USFSA set Harding's disciplinary hearing date on short notice, she "could not possibly prepare a defense to [the] charge in the time allotted." *Id.* 1478–79. The hearing date would therefore severely prejudice Harding's ability to obtain a fair hearing. Finally, because Harding had already asked the USFSA to continue the hearing date, and because that request had been denied, the court found that she had exhausted her internal remedies. *Id.* at 1479. The court then enjoined the hearing without any discussion of the Amateur Sports Act. In so ruling, however, the court noted that "injunctive relief is limited to correcting the breach of the rules. The court should not intervene in the merits of the underlying dispute." *Id.*

If this court applied the reasoning set forth in *Slaney* and *Harding,* the court would not interfere in the merits of the underlying dispute but could intervene to correct a breach by Defendants of their own rules if indeed satisfied that Defendants had clearly breached their own rules and if persuaded that the breach would imminently result in *serious* and irreparable harm to Lee and that Lee had exhausted all internal remedies.

Lee argues that the USTU breached its "rule" to "provide equitable support and encouragement for participation in programs for male and female Taekwondo athletes on a national basis without discrimination on the basis of race, color, religion, age, sex, or national origin." *See* Articles of Incorporation of the United States Taekwondo Union, Article V (attached to Plaintiff's Application for Tempo-

rary Restraining Order and Preliminary Injunction as Ex. 3). He asserts that he can only be removed if it appears that he "has failed to perform assigned duties satisfactorily." *See* USOC Bylaws § 19.6(D). He says that the USOC bylaws were violated when the criteria for coaches were changed right before the Olympic Games. *See* USOC Bylaws § 17.2(B) & (E). Even assuming that Defendants breached their own rules and that Lee will suffer serious and irreparable harm, Lee fails to show that he has exhausted his internal remedies.

Under § 220529(a), Lee "may obtain review by any regional office of the American Arbitration Association." The USOC's Bylaws similarly provide that coaches "may submit" to binding arbitration before the American Arbitration Association ("AAA"), which has authority,

> upon forty-eight (48) hours' notice to the parties concerned ..., to hear and decide the matter under such procedures as the AAA deems appropriate, if the AAA determines that it is necessary to expedite such arbitration in order to resolve a matter relating to a competition which is so scheduled that compliance with regular procedures would not be likely to produce a sufficiently early decision ... to do justice to the affected parties.

USOC Bylaws § 9.2 (made applicable to coaches by § 9.7). The Bylaws of the USTU similarly provide that "USTU agrees to submit to binding arbitration conducted in accordance with the commercial rules of the American Arbitration Association ... involving the opportunity of any ... coach ... to participate in amateur athletic competition." USTU Bylaws, Article XXVII, § 2.

Unlike *Harding*, this case involves no showing of insufficiency in the internal remedies regarding any alleged failure to follow rules. Because Lee has made no showing that he has even attempted to exhaust his internal remedies for the alleged violations of the rules, he may not bring the present action under the narrow exception to the Amateur Sports Act preemption doctrine set forth in *Slaney* and *Harding*. Accordingly, to the extent Lee is asserting that Defendants improperly failed to follow their own internal rules, that claim is dismissed.

**D.** *The Amateur Sports Act Does Not Prevent Lee From Proceeding Under § 1981.*

■ While the Amateur Sports Act grants the USOC exclusive jurisdiction over "all matters pertaining to United States participation in the Olympic Games," the Act does not expressly supersede other federal statutes. In other words, the Act does not expressly state that an athlete's or coach's federal rights independent of those conferred by the Act fall within "matters pertaining to United States participation in the Olympic Games." Defendants admitted at the hearing on the present motion to dismiss that they knew of no case holding that the Amateur Sports Act supersedes or nullifies federal anti-discrimination laws. The one case that this court has found that discusses federal discrimination claims against an Olympic body has recognized an individual's right to file suit in federal court, notwithstanding the Amateur Sports Act.

In *Sternberg v. U.S.A. National Karate–Do Federation, Inc.,* 123 F.Supp.2d 659 (E.D.N.Y.2000), the plaintiff, a member of the 1998 Women's Kumite (karate sparring) Team, alleged discrimination based on sex in violation of Title IX of the Education Amendment of 1972. The claim arose out of the decision by the national governing body for karate to withdraw the women's team from the world championship competition. *Id.* at 661. The plaintiff

claimed that the coach of the women's team withdrew it because he was afraid that the women might be injured. *Id.* The district court held that the plaintiff could proceed with her Title IX claims in court.

The court in *Sternberg* held that the plaintiff had an implied private cause of action for sex discrimination under the Amateur Sports Act because one of the Act's purposes is to encourage and provide assistance to women in amateur athletics. *Id.* at 664. On this point, *Sternberg* directly conflicts with § 220505(b)(9) and with the Ninth Circuit's decision in *Oldfield,* 779 F.2d at 507, which controls the present case. That does not mean, however, that the result in *Sternberg* is wrong.

While this court does not adopt the conclusion in *Sternberg* that the Amateur Sports Act provides a private right of action for discrimination, the court rules that *Sternberg* was correct in allowing the plaintiff to proceed with her Title IX claims because the Amateur Sports Act does not preclude such claims. This court similarly concludes that the Amateur Sports Act does not preclude a § 1981 claim.

■ In so deciding, this court is guided by the principle that, when two federal statutes may be reconciled, the court must give effect to both. That is the teaching of *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981), which states, "We must read the statutes to give effect to each if we can do so while preserving their sense and purpose." Similarly, *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), notes that, "when two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Accord Res. Invs., Inc. v. U.S. Army Corps of Eng'rs,* 151 F.3d 1162, 1165 (9th Cir.1998); *Hellon & Assocs., Inc. v. Phoenix Corp.,* 958 F.2d 295 (9th Cir.1992) ("to the extent that statutes can be harmonized, they should be, but in case of an irreconcilable inconsistency between them the latter and more specific statute usually controls the earlier and more general one").

Lee may proceed with his § 1981 claim so long as the remedy he seeks is not within the exclusive jurisdiction of the USOC. This court is not holding that a person has a private right of action under the Amateur Sports Act itself for violations of § 1981. Instead, the court holds that the Amateur Sports Act does not nullify or supersede other federal laws that provide private rights of action to ensure freedom from discrimination.[2] The Amateur Sports Act grants the USOC exclusive jurisdiction over "all matters pertaining to United States participation in the Olympic Games." 36 U.S.C. § 220503(3)(a) (2001). Discrimination on

**2.** While Lee may assert claims under § 1981 that are not precluded by the Amateur Sports Act, some of the relief Lee seeks would indeed be precluded. To the extent Lee is asking this court to name him the coach of the 2004 United States Taekwondo Team as a remedy for the alleged violation of § 1981, Lee is asking the court to infringe on the USOC's exclusive jurisdiction regarding all matters pertaining to participation in the Olympic Games. The court will not do this. At the hearing on the present motions, the court suggested that injunctive relief might, at most, take the form of an order directing Defendants to select the coach without violating § 1981. Defendants responded that a court-ordered selection process could conceivably conflict with or duplicate an arbitration remedy under the Amateur Sports Act. The court was not persuaded that this possibility nullified Lee's rights to relief for an alleged § 1981 violation. Courts are routinely faced with claims that, if all successful, would provide the same relief. When there is a danger of duplicative or conflicting remedies, dismissal is not necessarily the cure. In any event, because the court is denying Lee's motion for injunctive relief, the court need not determine how to fashion proper injunctive relief in this case.

the basis of race in violation of § 1981 does not pertain to the United States' participation in the Olympic Games, any more than the lease dispute that the court earlier hypothesized does. For the same reason that the USOC may sue and be sued in connection with the hypothetical lease dispute, the USOC and the USTU may be sued for alleged race discrimination in violation of § 1981.

As exhaustion of administrative remedies is not required with respect to § 1981 claims, Lee is properly before this court at this time on that claim. To the extent Defendants seek dismissal of Lee's § 1981 claim, their motion is denied.

### III. LEE'S MOTION FOR INJUNCTIVE RELIEF IS DENIED.

#### A. Standard for Injunctive Relief.

The standard for granting a temporary restraining order ("TRO") is identical to that for a preliminary injunction. *Hawaii County Green Party v. Clinton*, 980 F.Supp. 1160, 1164 (D.Hawai'i1997). To obtain either, a party must demonstrate: 1) probable success on the merits and irreparable injury; or 2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief.[3] *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir.1993). These two formulations represent two points on a sliding scale, with the required degree of irreparable harm increasing as the probability of success decreases. *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994). These formulations are not separate tests, but the extremes of a single

continuum. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir.1980).

"If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Alaska v. Native Vill. of Venitie*, 856 F.2d 1384, 1389 (9th Cir.1988) (*quoting Aguirre v. Chula Vista Sanitary Service*, 542 F.2d 779 (9th Cir.1976)). If the plaintiff shows no chance of success on the merits, the injunction should not issue. Moreover, under any formulation, the moving party must demonstrate a "significant threat of irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987). Finally, a plaintiff must do more than merely allege imminent harm sufficient to establish standing; he or she must demonstrate immediate threatened injury as a prerequisite to injunctive relief. *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir.1991), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992).

■ To the extent Lee seeks reinstatement as the head coach of the 2004 United States Olympic Taekwondo Team, he is seeking something more than preservation of the status quo. The Ninth Circuit has called such relief "mandatory preliminary relief," noting that "mandatory preliminary relief" is disfavored and should not be issued unless the facts and law clearly favor the moving party. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979); *accord*

---

3. Traditionally, there were four factors to be considered in deciding whether an injunction or restraining order should issue: 1) the likelihood of the plaintiff's success on the merits; 2) the threat of irreparable harm to the plaintiff if the injunction is not imposed; 3) the relative balance of the harm to the plaintiff and the harm to the defendant; and 4) the public interest. *Alaska v. Native Vill. of Venitie*, 856 F.2d 1384, 1388 (9th Cir.1988). These factors have been collapsed into the current test. *See id.*

*Martin v. Int'l Olympic Comm.,* 740 F.2d 670, 675 (9th Cir.1984) (construing as claims for mandatory preliminary relief attempts by women runners to add 5000–meter and 10,000–meter races to the 1984 Olympic Games in Los Angeles and cautioning that, when a party "seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite,* courts should be extremely cautious about issuing a preliminary injunction").

### B. *Findings of Fact.*

In an effort to rule overnight on the merits of Lee's expedited motion for injunctive relief, and to avoid the burden on the court's over-extended court reporters, the court did not request and therefore does not have a transcript of the live testimony, although the court was provided with a "rough" transcript. Therefore, in referring to any testimony in these findings of fact, this court is unable to give any citations to a page or line of a transcript. Based on the live testimony and the exhibits received in evidence, the court finds the following by a preponderance of the evidence.[4]

1. A hearing was held on August 12, 2004. The court received testimony from Lee, Han Won Lee, Sammy Pejo, Virginia Witte, Robert Gambardella, Kelly Skinner, Steven Lopez, and Nia Abdallah. Except as otherwise stated in this order, the court has no reason to doubt that these witnesses testified credibly. All direct testimony was presented in writing in the form of declarations filed with the court. Any cross-examination and redirect testimony were live, in accordance with this court's nonjury civil evidentiary procedures, posted on the court's web site under this judge's "Trial Procedures" at *www.hid.uscourts.gov* and described in *Kuntz v. Sea Eagle Diving Adventures Corp.,* 199 F.R.D. 665 (D.Haw.2001).

2. The court received Exhibits 1–19, 21–26, 28–30, 32, 35–40, and D–2 through D–6 into evidence.

3. Lee was born in Korea and moved to Hawaii when he was twelve. He has been a United States citizen since 1977. Lee currently resides in Honolulu, Hawaii, where he owns and operates a taekwondo school. Affidavit of Dae Sung Lee (Aug. 11, 2004) ¶¶ 1, 3.

4. Lee says that taekwondo originated in and is considered to be the national sport of Korea. Lee Aff. ¶ 6. Lee says that, because of this, a high percentage of taekwondo masters, school operators, competitors, and coaches are of Korean heritage. *Id.* ¶ 7. Lee says that, at all levels, including management, the USTU attracted a high percentage of Americans of Korean ancestry. *Id.* ¶ 9.

5. Lee is a highly successful taekwondo athlete. He won a gold medal in the 1987 Pan American Games, and was the national taekwondo champion from 1979 through 1987. *See* Letter from Dae Sung Lee to Bob Gambardella (June 2, 2004) (Ex. 11); Resume of Dae Sung Lee (Ex. 1). Lee has also been a highly successful taekwondo coach, coaching various United States teams since 1989 and coaching two gold medalists at the 2003 Pan American Games. *See* Letter from Dae Sung Lee to Bob Gambardella (June 2, 2004) (Ex. 11).

6. In the spring of 2003, Lee was selected by the USTU to be the coach of the 2004 United States Olympic Team. Pejo

---

4. To the extent any finding of fact should more properly be designated a conclusion of law, it should be treated as a conclusion of law. Similarly, to the extent any conclusion of law should more properly be designated a finding of fact, it should be treated as a finding of fact. For ease of reference to particular findings and conclusions in later proceedings, if any, the findings and conclusions are presented in numbered paragraphs.

Decl. ¶ 7. In October 2003, Lee was told by the then executive director of the USTU, Bruce Harris, that he had been approved by the USOC as the 2004 United States Olympic Team head coach for taekwondo. *See* Lee Aff. ¶ 24–25; Email from Patricia Howard to Michelle Farrell (forwarded to Dae Sung Lee) (October 8, 2003) (Ex. 7). Lee says that the selection process involved a nomination by the USTU Coaching Science Committee, which included 18 previous coaches and retired competitors; approval by a majority vote of the executive board of the USTU; and approval by the USOC. Lee Aff. ¶ 15.

7. At the time Lee was selected as the head coach, the USTU's criteria for selecting the coach focused on the coach's experience in international competitions, as opposed to the familiarity the coach had with the athletes on the taekwondo team. Declaration of Robert P. Gambardella (Aug. 6, 2004) ¶ 7. Although there is no dispute that selected coaches were well-qualified, they sometimes acted more as team leaders than as coaches for the individual athletes.

8. For example, in the 2000 Sydney Olympics, Steven Lopez, a competitor from the United States, won a gold medal after asking the coach of the taekwondo team to move so that he could see and understand the advice being given by his personal coach, Jean Lopez. Jean Lopez, who is Steven Lopez's brother, was located in the stands, rather than ringside. *Id.;* Declaration of Steven Lopez (Aug. 8, 2004) ¶ 5; Lopez Testimony. Of course, this example also demonstrates that it is possible for athletes to win medals in Olympic competitions even though their personal coaches are not ringside. *See* Declaration of Han Won Lee (July 27, 2004) ¶ 7. It is also possible for a ringside coach who is not an athlete's personal coach to provide valuable advice. *See* Lee Aff. ¶ 56 (indicating that Steven Lopez's ringside coach at the 2000 Olympics gave Lopez advice that

earned Lopez a point in the gold medal match).

9. As coach of the 2004 Olympic Taekwondo Team, Lee traveled to various international qualifying events, sometimes at his own expense. *See* Lee Aff. ¶ 22–23. Lee testified that he went to these events to observe and scout the various taekwondo athletes.

10. About the same time that Lee was informed that he had been approved by the USOC as the coach of the 2004 United States Olympic Taekwondo Team, the Membership and Credentials Committee of the USOC ("M & C") completed a compliance review of the USTU. M & C concluded that the USTU was not in compliance with USOC rules and asked the USOC to revoke the USTU's membership in the USOC as well as the USTU's designation as the national governing body for the sport of taekwondo. *See* Declaration of Virginia Witte (Aug. 6, 2004) ¶ 27; Declaration of Samuel Pejo (Aug. 10, 2004) ¶ 5 ("there was a conflict between the United States Olympic Committee (USOC) and the USTU over alleged financial mismanagement as well as other criticisms").

11. Financial audits of the USTU had indicated "a pattern of severely insufficient financial reporting and controls," as well as managerial deficiencies. Witte Decl. ¶¶ 7, 21. Witte testified about various financial and managerial problems at the USTU, including the USTU's lack of appropriate documentation and its inappropriate use of USOC funds. *See also* August 29, 2003, Audit, Executive Summary (Ex. 38) (indicating, for example, that the USTU had to repay the USOC $132,459 for disallowed expenses, that USTU volunteers should stop participating in the daily operations of the finance department, and that the USTU had to "install adequate controls over cash receipts ... to better account for funds and safeguard physical assets").

Witte testified that, in the fall of 2003, the USOC actually froze funds that it was providing to the USTU as a result of the USTU's financial and managerial problems.

12. On or about October 18, 2004, the USOC Board of Directors adopted a resolution to revoke the USTU's membership in the USOC as well as its designation as the national governing body for the sport of Taekwondo. Witte Decl. ¶ 27. While the actual decertification was proceeding, the USOC and the USTU developed a remediation plan to allow the USTU to remain as the national governing body for the sport of taekwondo. This plan required all of the USTA's officers to resign, which they did. *See* Witte Decl. ¶ 30; Agreement (executed Jan. 27, 2004) (Ex. D2) (setting forth terms of remediation agreement).

13. On or about April 8, 2004, Lee was informed that he was no longer the 2004 United States Olympic Team head coach for Taekwondo:

As you might expect, with the change in management and governance at the USTU, there has been a change in view about the head coach position for the Athens Games.

After formation of the USTU Governance and Management Committee (the "Committee") and my being named to the position of CEO/Secretary General, the Committee and I met to discuss how to maximize USTU's performance in Athens. We felt that the selection procedures for the coach at the Athens Games needed to be reevaluated to ensure that the coaching position is best utilized in a way to match up the coach with those athletes who will be selected to compete at the Games.

Also, as you know, the USTU failed to qualify more than two athletes to compete in the Games in Athens.... As a result, the number of credentials available for the U.S. Olympic Team, and for the sport of Taekwondo in particular, has been reduced dramatically. Previously it was thought that Taekwondo would receive two credentials, one for team leader and one for coach. That number has been reduced to one. Rather than use the single credential designated for the team support for Taekwondo on a team leader position, the USTU has determined that it will attempt to maximize athletic performance by providing a credential to the coach, who must also fulfill the team leader duty if called upon.

Based on the recommendation of the Committee, the USOC Executive Committee on April 12, 2004 vacated its prior approval of Taekwondo's staff selection procedures for the Athens Games. The USOC Executive Committee also vacated its prior approval of the coach and team leader nominations for Taekwondo. Thus, your selection as coach for Taekwondo has been vacated.

*See* Letter from Bob Gambardella to Dae Sung Lee (Apr. 8, 2004) (Ex. 10).

14. The new management of the USTU then approved the following coaching criteria:

Position of head coach will be selected based on the following criteria, in priority order:

▲ Number of athletes the coach has placed on the 2004 Olympic Team.

▲ Competition record (from June, 2003, to June, 2004) of the athletes placed on the 2004 Olympic Team. Priority consideration will be given to results from, in priority order:

• 2003 World Championships

• 2003 Pan American Games

*See* Attachment to Letter from Bob Gambardella to Dae Sung Lee (Apr. 8, 2004) (Ex. 10). Gambardella Decl. ¶ 8. Accord-

ing to Gambardella, the new coaching criteria were adopted without regard to any prospective coach's sex, race, and/or national origin. Gambardella Decl. ¶ 13. The new management of the USTU thought that the new criteria would give the athletes the best chance at winning medals in the Olympic Games. Declaration of Kelly Skinner (Aug. 6, 2004) ¶ 10.

15. Lee testified that, in April 2004, he received a copy of the new criteria for choosing the coach of the 2004 United States Olympic Taekwondo Team. Lee testified that he was not coaching any athletes competing for a spot on the 2004 United States Olympic Taekwondo Team. Accordingly, Lee either knew or should have known that he did not meet the first criterion and therefore was highly unlikely to be named coach of the team again.

16. In qualifying events in June 2004, only one man, Steven Lopez, and one woman, Nia Abdallah, from the United States qualified to compete in taekwondo events during the 2004 Olympic Games in Athens. Gambardella testimony; Gambardella Decl. ¶ 11; Lopez Decl. ¶ 1; Declaration of Nia Abdallah (Aug. 6, 2004) ¶ 1. Only Jean Lopez (Steven Lopez's personal coach) and Chul Ho Kim (an American of Korean ancestry who is Nia Abdallah's personal coach) met the first criterion for coaching the 2004 United States Olympic Taekwondo Team. Gambardella Decl. ¶ 11; Witte Decl. ¶ 38. Because Steven Lopez had a better 2003 competition record, his personal coach, Jean Lopez, was nominated by the USTU and approved by the USOC to serve as the coach of the 2004 Olympic Taekwondo Team. Gambardella Decl. ¶ 11; Witte Decl. ¶ 38; Gambardella Testimony. Han Won Lee, the coach of the 2000 Olympic Games Taekwondo Team, testified that Defendants properly applied the new coaching criteria in choosing Jean Lopez as coach.

17. Because the new coaching criteria were set forth in April 2004 before the athletes were chosen in June 2004, no one could have been certain at the time the new criteria were set who would become the head coach. The new coaching criteria were not racially biased, either on their face or in fact. Had Steven Lopez not qualified for the Olympics, for example, Nia Abdallah's coach, Chul Ho Kim, who is of Korean heritage, might have become the coach of the 2004 United States Olympic Taekwondo Team.

18. On or about July 21, 2004, the USTU informed Lee that Jean Lopez had been nominated by the USTU to be the 2004 Olympic Taekwondo Team coach and that Lopez's nomination had been approved by the USOC on July 19, 2004. *See* Letter from Bob Gambardella, CEO/Secretary General of the USTU, to Ward D. Jones, attorney for Lee (July 21, 2004) (Ex. 13).

19. In addition to sending Jean Lopez to Athens to coach the two taekwondo athletes, the USTU paid for Chul Ho Kim, Nia Abdallah's coach, to go to her training camp in Malta and then to Athens to coach her in the competition. Gambardella Decl. ¶ 12. Chul Ho Kim will have to coach Abdallah at the Olympic Games from the stands, however, unless the USTU can obtain a second coaching credential to allow Chul Ho Kim to coach her ringside. The USTU is currently seeking that second coaching credential. *Id.* Determinations as to how many credentials are given to a team and who gets those credentials are made by the organizers of the Olympic Games in Athens in conjunction with various International Olympic Committees like the USOC. Gambardella Testimony.

20. Both Steven Lopez and Nia Abdallah expressed a strong preference for having their personal coaches ringside. They both believe that having their personal

coaches ringside will give them a competitive advantage and that having Lee ringside, as opposed to their personal coaches, will be a competitive disadvantage. *See* Lopez Decl. ¶¶ 4–7; Abdallah Decl. ¶¶ 4–7. Both also testified that, even if they were permitted to have their personal coaches ringside, having Lee as the team coach would be a "distraction." Neither Lopez nor Abdallah was asked to explain or otherwise support this opinion as to "distraction." The court notes that Lopez and Abdallah both testified to this using the same verbiage, suggesting coaching by counsel as to this subject. On this point only, the court questions Lopez's and Abdallah's testimony, although the court does not deem their views on this particular matter to be material to this order.

21. Contrary to Lopez and Abdallah, Han Won Lee, the coach of the 2000 Olympic Games Taekwondo Team, opined that there is no advantage to an athlete's having his or her personal coach ringside. *See* Declaration of Han Won Lee (July 27, 2004) ¶ 7 ("Declarant is of the opinion that pairing an athlete with their 'home' coach does not increase chances of success.").

22. Dae Sung Lee believes that "the team" will have a better chance of success if he is the coach of the 2004 United States Olympic Taekwondo Team. Lee says that he was removed as the coach of the 2004 United States Olympic Taekwondo Team because he is of Korean ancestry, rather than because the USTU wanted to give the athletes a better chance at earning medals. Lee points to several letters that he claims demonstrate racial animosity toward people of Korean ancestry by USOC members. For example, in an August 2003 letter, the USOC details numerous problems it believes the USTU has, including a perceived "allegiance to Korea to the detriment of U.S. programs and the interests of U.S. athletes." *See* Letter from Thomas L. Satrom of the USOC to Bruce Harris,

the executive director of the USTU (Aug. 4, 2003) (Ex. 4).

23. Lee also points to a September 2003 letter in which the USOC asks the USTU:

How does USTU respond to the perception that the USTU is governed by cultural values emanating from Korea, which may not be in harmony with American values. The perception seems to be that loyalty to one's instructor or superior is all important, that "respect" means subservience, and that competitions are often based on "political determinations," not on who is the best athlete on the mat. As an individual stated to the Committee, "[l]ong ago I realized the USTU leadership could never be held accountable. For the most part, they did not understand our American culture of sport nor embrace its underlying values of un-biased officiating, a level playing field, and fair play." As another individual stated to the Committee, "Korean culture places a higher value on loyalty to one's family, friends, school, etc. than it does on honesty and fair play. The result is that the best man usually doesn't win, but the favorite son does." As a third individual stated, "the 'Korean good ol' boy' system of promotions, certifications, and selections of 'who attends what' has got to go."

*See* Letter from Thomas L. Satrom, of the USOC, to Bruce Harris, executive director of the USTU (Sept. 5, 2003) (Ex. 5).

24. Lee also points to an October 2003 letter in which a USTU member reports overhearing a member of the USOC refer to the USTU as "a Korea Mafia-run organization." *See* Letter from Bruce Harris, executive director of USTU, to Sang Lee, president of the USTU (Oct. 9, 2003) (Exhibit 6); Pejo Aff. ¶ 6 ("Declarant was told that members of the USOC membership and Credentials Committee referred to

USTU management as the Korean Mafia.").

25. Lee says that the remediation plan that removed the former management of the USTU had a disparate impact on Americans of Korean ancestry, who were the majority of that former management. *See* Lee Aff. ¶ 30.

26. Lee says that the creation of new coaching criteria violated the Bylaws of the United States Olympic Committee. Section 17.2 of those Bylaws requires each national governing body, like the USTU, no less than 18 months before each Olympics, to submit to the USOC's chief executive officer "a written proposal concerning the participation of the United States in the particular sport or even of the forthcoming Olympic[s].... This proposal shall include the number of athletes and team officials to be nominated .... and any other matters that may be relevant for effective planning of the United States's participation in the particular sport or event....:" USOC Bylaws, § 17.2(B) (Ex. 29). The Bylaws also require national governing bodies, at least 12 months before the date of the final tryouts, to submit to the USOC's chief executive officer a list of eligible persons, together with their resumes, from which team officials will be selected. USOC Bylaws § 17.2(E).

27. According to the USOC Bylaws, "[a]ppointment as a team official may be revoked at any time by the [USOC's Board of Directors] ..., if it appears that the official has failed to perform assigned duties satisfactorily." USOC Bylaws, § 19.6(D). No evidence was introduced indicating that the USTU had any rules regarding the USTU's power to remove the coach of the 2004 United States Olympic Taekwondo Team.

C. *Conclusions of Law.*

1. In pertinent part, § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

2. A prima facie case under § 1981 is established by proof of facts supporting an inference of intentional discrimination. In *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30,* 694 F.2d 531 (9th Cir.1982), the court said:

Since a prima facie section 1981 case, like a prima facie disparate treatment case under Title VII, requires proof of intentional discrimination, the focus of the judicial inquiry must be whether the plaintiff has proven by a preponderance of evidence facts from which the court must infer, absent rebuttal, that the defendant was more likely than not motivated by a discriminatory animus. Under both statutes, the court must make a sensitive inquiry into the direct and circumstantial evidence of discrimination offered by the plaintiff in order to determine if the facts so proved allow a legally-permissible inference of discriminatory intent. Accordingly, it is not inappropriate to allow section 1981 claimants to avail themselves of Title VII discriminatory treatment standards in proving a prima facie case.

*Id.* at 538.

3. The burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), therefore applies to Lee's § 1981 claim. *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1264 (9th Cir.

1997) (applying burden-shifting analysis to § 1981 claim), *superseded by statute on other grounds as stated in Leisek v. Brightwood Corp.*, 278 F.3d 895, 899 n. 2 (9th Cir.2001); *Gay*, 694 F.2d at 549 (stating in dicta that, even had the plaintiffs established a prima facie case, the evidence was sufficient to support the conclusion that the employer had rebutted any inference of discrimination); *accord Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir.2001) ("Where, as here, no direct evidence of discrimination was proffered by the plaintiff, we apply the McDonnell Douglas ... burden-shifting analysis to the Title VII and Section 1981 claims."); *Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 112 (3d Cir.1996) (stating that the burden-shifting analysis established in *McDonnell Douglas* is the appropriate analysis for summary judgment motions in cases alleging violations of Title VII and § 1981); *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir.1993) (stating that plaintiffs bringing suit under § 1981 or Title VII can meet their burden of proof for establishing intentional discrimination either through direct proof of discriminatory intent or through the indirect, burden-shifting method of proof elaborated in *McDonnell Douglas* ).

4. Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first demonstrate a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff can make a prima facie case for discrimination, then the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the allegedly discriminatory conduct. Finally, if the defendant can articulate some legitimate, nondiscriminatory reason for the allegedly discriminatory conduct, then the plaintiff must be given a full and fair opportunity to demonstrate by competent evidence that the reasons articulated by the defendant are in fact a pretext or a cover-up for its discriminatory decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (analyzing Title VII claims); *Lam v. University of Hawaii*, 40 F.3d 1551, 1559 (9th Cir.1994) ("After a *prima facie* case is established, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.") (internal quotation marks omitted).

5. A discrimination plaintiff carries the initial burden of showing actions taken by the employer from which one may infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on discriminatory criterion illegal under the Act." *Furnco Constr. Corp v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). A prima face case "in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Proving a prima facie case is not onerous. *Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1111 (9th Cir.1991) ("evidence may be either direct or circumstantial, and ... the amount that must be produced in order to create a *prima facie* case is very little") (internal citations omitted).

6. Even assuming Lee has shown a prima facie case of discrimination under § 1981 based on the USOC comments pertaining to people of Korean ancestry, Defendants have shown legitimate, nondiscriminatory reasons for their actions. Defendants have introduced evidence indicating that the management of the USTU was removed because of financial misman-

agement. Defendants have introduced evidence that the criteria for the Olympic coaching job was changed in a nondiscriminatory manner based on athletes' relationship with their personal coaches in an attempt to improve their chances at earning medals. Given these legitimate, nondiscriminatory reasons, the burden shifted back to Lee to demonstrate pretext. Although Lee has questioned the effectiveness of the USTU's coaching strategy, Lee has introduced no evidence of pretext. Accordingly, he has shown no chance of success on his § 1981 claim at this point and is not entitled to injunctive relief.

7. Similarly, if this court assumes, under the "serious questions/balance of hardships" test for injunctive relief, that Lee has raised serious questions as to the merits of his claim, the balance of hardships does not tip in his favor. Although Lee will miss out on the experience of being ringside at the Olympic taekwondo competition, and will therefore miss out on an opportunity that may help his reputation and his taekwondo school, the same can be said of any person Lee replaces. In his Reply in Support of the Injunction Motion, Lee recognizes that Jean Lopez and Chul Ho Kim have an interest in coaching their own athletes in the Olympic Games. Lee therefore modified his injunctive relief request, asking this court to force Defendants to have two credentialed taekwondo coaches at the Olympics. The problem with this argument, however, is that there is no evidence indicating that the United States Taekwondo team is entitled to two credentialed coaches. This court is certainly powerless to order the Athen's Olympic organizers to issue such a credential. Moreover, Lee's requested relief is precisely the kind of relief that is preempted by the Amateur Sports Act. Even if the team were able to get a second credential and this court ordered that it go to Lee, Chul Ho Kim would then suffer the same injury Lee claims now, i.e., being unable to be ringside.

8. Lee waited to the last moment to file this action, as he knew or should have known back in April of this year that he would not be chosen as the new coach. Although it may be difficult to place a monetary value on being the coach of the 2004 Olympic Taekwondo Team, should Lee prevail on his § 1981 claim, he may be able to get monetary damages. Under these circumstances, Lee has not demonstrated entitlement to injunctive relief.

## IV. *CONCLUSION.*

For the foregoing reasons, except to the extent that Defendants' seek dismissal of Lee's § 1981 claim, Defendants' motion to dismiss is granted.

For the foregoing reasons, Lee's motion for injunctive relief is denied.

IT IS SO ORDERED.